May I proceed? Thank you, Your Honor. May it please the Court, and good morning. My name is Kevin Kallnog. I have the pleasure of representing Mr. Sim for the unfortunate events that happened in August of 2014 and the subsequent denial of medical care thereafter. The Eighth Amendment is tough, it really is, but it's not impossible. With the medical care provided to Mr. Sim, there is definitely a constitutional violation that warrants jury consideration, and a summary judgment should not have been granted in defendant Dr. Joel Hall's and Dr. Patel's favor. One of the issues that the Magistrate Judge focused on in granting the motion for summary judgment was that he found it to be immaterial that there was no medical monitoring of Mr. Sim for the first 24 hours after his head injury. I think that that is a very material fact that does warrant jury consideration. Counsel, do you agree or not that in order for you to have survived summary judgment, there had to be admissible expert testimony as to, at the very least, standard of care violations? Not when Dr. Patel has indicated what his own standard of care was and that he did not file that standard of care. So would you concede that there is nothing in Dr. Zarduz's first report or second report which establishes that either of the physician defendants breached the standard of care? The second report, I do believe, does address the lack of treatment. Where? I have it in front of me. Why don't you tell me where? Yes. He discusses how there was no medical treatment or monitoring within the 24 hours. But the conclusion in the report is, in this particular case, I can state that Mr. Sim did not receive medical care in a timely manner. But there is nothing that I can find where he discusses any particular below-the-standard-of-care failure by either of the physician defendants. So if you can point me to specific language, I think that report starts on 3 ER 600, right? I believe you're correct, Your Honor. I believe it's on page 2 of that second report where he discusses how there was untimely care provided, not only during the first 24 hours, but then also from September 4 through the 10th. Okay. Well, it says what it says. I don't see it there, but go ahead. Let me ask you this globally. You know, medical malpractice is one thing. Deliberate indifference is another. So what facts do you point to that shows an Eighth Amendment violation as opposed to a claim for medical malpractice? And that's actually a point that I was going to go to next, Your Honor. Regardless of a standard of care in the report, I don't believe that that is required for an Eighth Amendment violation. All that's required is that adequate medical care is not provided to someone in need of it. And Dr. Patel even opined that his own practices, the policy of the prison, is that medical care, medical monitoring is provided within the first 24 hours with this type of a head injury. And along with that— It has to be deliberate indifference. So what's your best fact on deliberate indifference as opposed to a violation of the standard of care? Correct. And with deliberate indifference in the medical context, it's a less stringent standard. And it's the knowledge that Dr. Patel knew that with this type of a head injury that Mr. Sim had, that he was required to be medically monitored, which could have been done if he was put in the CTC facility, which Dr. Patel did not do. Along with that, the nursing staff— He did enter an order for the nursing staff to monitor him for the— two rounds and then four hours for the next two rounds after that. That never happened. There's no evidence that that occurred. And then the next day when Mr. Sim is found, he's in a Code 3 stage, which is a life-threatening condition. And at that point, Dr. Patel even indicated— and this is a bizarre fact in this fact pattern, Your Honor— that he was shocked that there was no CT scan ordered and that also that he wasn't monitored overnight when the responsibility was on Dr. Patel for that very fact. Now, the— When you say the responsibility was on him for that very fact, to do it or to witness the nursing staff doing it, what exactly was his personal responsibility? Because you can't have deliberate indifference based on some respondeat superior, right? Correct. It cannot be based on vicarious liability, but it can be based upon supervisory liability. And I believe that's where the Lopez case is right on point. And this case is even stronger than Lopez. In Lopez, there was an order for the inmate to be provided a liquid diet, if I'm not mistaken. And the prison officials that are apart from the medical side of the prison facility did not ensure that that happened. But the Ninth Circuit found that there was still liability on the medical side for the doctor who did not ensure that that order was followed. That's no different here, if not stronger here. So the physician should have done exactly what he should have. He was required to witness the nursing staff do this. He was required to do it himself for Eighth Amendment purposes. Specifically, what was he personally required to do on this issue? He was to ensure that his order is followed up on. The easiest manner in which he could have done that was to have Mr. Sim transfer to the CTC facility. That would have guaranteed medical monitoring in that facility. It's set up just for that very purpose. Is there anything in Dr. Zarduz's medical opinions that says what you just said, that Dr. Patel was required to, for example, transfer him to CDC? No, that is not in Dr. Zarduz's written report. But he did indicate, apart from the CTC, that medical monitoring was required within the first 24 hours. And Dr. McIntyre's report specifically, if I have that name right, did specifically address what both physicians did and did specifically opine to reasonable medical certainty or probability that everything they did was appropriate, correct? That was his opinions. And there's a difference of opinions between the two experts, which warrants jury consideration. Well, but again, that goes to my first point. I don't see anything in Dr. Zarduz's opinions where he says, here is a failure, for example, a specific failure by Dr. Patel. And I think what the Court is getting at, and that's what the Magistrate Judge focused on, was that there's no specific mention of Dr. Patel in Dr. Zarduz's report. I don't think that that's required for an Eighth Amendment violation. And it's kind of a double-edged sword. Let's just say if that opinion was offered, that then there'd be a fight on the opposite side indicating that Dr. Zarduz is offering a legal conclusion, which is what they did with the related expert in this matter. And so it's really a catch-22 on it. I don't think the more specificity regarding the standard of care and how it was violated would not be stating a legal conclusion. But I also want to return to Judge Thomas's sort of more global question about how do you get past, you know, the negligence standard to the deliberate indifference standard. On the, you know, even on their supervision, I think even for negligence supervision liability, you would have to show that some evidence that you could prove that a doctor had known or had reason to know that the people he was supervising were not going to carry out his orders. And I don't see anything specific on that, and then much less rising to the level of deliberate indifference. There's no indication or any fact in the record that shows that he even instructed the nursing staff to do and to follow his orders. It would be no different as if the order was entered and thrown in the trash. Well, isn't it reasonable to assume if a doctor puts in an order that the people who are, their job is to carry out that order would follow it? I mean, I don't see any evidence that he routinely put in orders and they were routinely not followed such that he was on notice, that he needed to do more. And this falls back on the CTC availability, which would have solved all these problems. One of the things that Dr. Patel did indicate is that he knew that with Mr. Sim, and this is after the first 24 hours, this is the next time he saw him on September 10th, he indicated that he knew that based upon the objective symptoms that Mr. Sim was presenting with, that he was at risk for seizures. He indicated that, yet there is no referral for a neurologist, there is no recommendation or prescription for any seizure medication, that there's no further step at that point for treatment for that specific risk, which he was aware of. At that time, had your client been seen by a neurologist? Who was he seen by in the first, was it the community facility? At the hospital, he did have CT scans. So he had CT scans, which were presumably interpreted by experts. And they were positive findings, correct? There was positive findings for brain bleeds that he had. And were there recommendations from that hospital that Dr. Patel did not follow when he was discharged from the hospital? When he was discharged, it was recommended that Mr. Sim would be monitored, which did not happen. It didn't happen, but you agree that Dr. Patel's written orders directed that it happen? When Mr. Sim returned to the Wasco State Prison, there was no order. What was the direction to the nursing staff? The direction is to keep monitoring of Mr. Sim. And then there was an entry by a nurse that Mr. Sim was to be seen by a medical doctor within three to five days. That did not happen during that time frame. On September 8th, Mr. Sim presented to medical where Dr. Patel was, and Dr. Patel turned him away during that time frame, which he should have been seen. But going beyond that, at that point when Dr. Patel sees Mr. Sim on September 10th, he did have knowledge of Mr. Sim's condition, and there was no adequate treatment provided at that point. Dr. Patel, with respect to his credentials, isn't qualified as a neurologist to treat the symptoms that Mr. Sim was presenting with. And then the same thing happened on October 1st when Mr. Sim presents with Dr. Johal. She's not qualified as well, and all due respect to her qualifications as well, but she instead told Mr. Sim, you know, you're faking it, nothing's wrong with you, stop putting in medical requests. And that's something that I believe a lot of facts were ignored were the health service request forms that were being submitted by plaintiff during that time frame. Those are facts that warrant jury consideration. Do you want to reserve? I do want to address the trial issue about the ricochet. There's just no facts supporting a ricochet. No one saw a ricochet. Allowing the defense expert to give that opinion was improper. It was an abuse of discretion. I'm sorry, correct me if I'm wrong, didn't the defense expert simply opine that with this type of 40-millimeter weapon and these type of projectiles that a ricochet was possible? He indicated that it was possible, but that's the whole issue, is that it allowed the jury to consider this as a negligence case instead of an abuse. Didn't your expert also opine that it was possible? He was precluded from doing so. I thought on cross-examination he testified ricochet with this weapon was possible, but maybe I'm wrong. To clarify, the defense was allowed to question him on that, and then the plaintiff was not allowed to follow up on how there was no ricochet here. That's the whole issue with respect to the ricochet. And I don't know if any of your honors maybe play pool or billiards. The way that a ricochet would happen, it's impossible for it to hit Mr. Sim on the left side of his head. If it's a guard tower, it's shot in the general direction of where we all agree where it was shot. It should have hit Mr. Sim on the right side of his head, and in fact the appellee's brief nowhere mentions the left side of Mr. Sim's head because they know that it's just not plausible. But that opinion was not anywhere in your expert's report, correct? No, it was. Mr. Clark opined that Defendant Duran took direct aim. Right, I understand that, but there's nothing in the report that talks about whether or not there could have been a ricochet here, right? The word ricochet is not in his report, but that's the thing. I don't believe the rules are that stringent where he opined that there was direct aim at Mr. Sim with his weaponry, which is, you know, with six stapled sutures on his head. Well, he opined, and the district court precluded this, he opined that based on his review either the officer was lying about her training or she had aimed the weapon directly at him and fired, right? He didn't give that opinion at trial. Right, but that was what his report said, right? He indicated based upon the facts he reviewed that she was aiming directly at him because there was no other explanation. Or that she had lied about her training. Correct, but that was precluded. Thank you, Counsel. Thank you, Your Honors. Good morning, and may it please the Court. My name is Oliver Wu on behalf of defendants. This Court should affirm the summary judgment order in defendant's favor as well as the jury verdict. So to briefly address Mr. Sim's argument about the summary judgment order, he mentioned he argues that Dr. Patel was responsible for making sure that the nursing checks happened, but Dr. Patel, the record is undisputed that Dr. Patel entered the order for overnight nursing checks, and he was reasonable in expecting that nursing staff or correctional staff would carry out the orders he inputted into Mr. Sim's medical records. And generally speaking, vicarious liability is not available unless there is some evidence to show that Dr. Patel knew these checks would not be carried out. And earlier, there was discussion about what the emergency room doctors recommended that be done. When Mr. Sim was returned to the prison after the incident on his first visit to the ER, he was diagnosed with just a scalp laceration. And so the emergency room doctors recommended wound care. They did not recommend any heightened level of care. They did not recommend that he be provided overnight checks. Dr. Patel entered these overnight checks out of an abundance of caution, given that Mr. Sim had just suffered a head injury. So the Lopez case cited by Mr. Sim by appellants is distinguishable. In that case, the physicians were recommended by other experts to provide a certain level of care and to provide certain treatment, and they did not follow through. But in this case, Dr. Patel did follow through on the recommended care, and he actually recommended even more care. And after that night, after the first night back at the hospital, he was returned to a different emergency room where they took CT scans and found that he had no fracture and no severe brain bleeds. He stayed at the hospital for two days, and once the hospital determined that he was stable and could be returned to outpatient care, he was returned to the prison. And so there was no indication that Mr. Sim needed any inpatient level of care, any heightened level of care, which is why he was not sent to the CDC. So, counsel, the plaintiff submitted, I think it was a declaration, that both physician defendants in his presence basically accused him of overstating his symptoms and malingering, correct? Yes. And I understand that the physicians dispute that, but on summary judgment, we have to, as the district court has to and I think did, take that as true, right? Yes. So if we take that as true, that the physicians basically told him to go away and you're malingering, why couldn't that support an inference that Dr. Patel was aware and just didn't care that the nurses hadn't followed his orders for the checks? I have a couple of responses to that. First, despite the fact that Mr. Sim claimed that the physicians accused him of malingering, the record is filled with examples of what Dr. Patel and Dr. Johal did, in fact, provide. And they provided numerous neurological and specialist consults. They provided him medication. They adjusted his medication. And they also sent him out for outside hospital care when needed. And so even if these doctors made these statements, at the end of the day, they did provide him with medical care, and so they were not deliberately indifferent. And that's what the district court said. No matter how inappropriate these comments may have been, the district court felt that the district court had a look at the record to see if there was or wasn't deliberate indifference in what was provided. Correct, Your Honor. Counsel, in terms of timing, my understanding is that there's a point in time in essentially the first 24 hours after the injury that the plaintiff's counsel or plaintiff's is saying that that's where a lapse of care happened. In relation to that first 24 hours in the injury, when did the comments about alleged malingering occur? So I believe that those comments were after he was returned to the prison. Do you know how far after? I don't know, Your Honor. But I do believe that for most of the first 24 hours after the incident, Mr. Sim was being treated at an outside hospital. Dr. Patel examined Mr. Sim immediately after the incident, evaluated him, and sent him out to an outside hospital for care. And Dr. Patel was permitted to rely on the diagnosis by the outside doctors and the ER doctor's conclusion that Mr. Sim did not need any additional care other than wound care. So in this case, Dr. Patel simply acted reasonably during his portion of the treatment. As for Dr. Johar, Dr. Johar referred him out to a neurologist and followed the neurologist's recommendation about medication and about further specialist consult. She referred him to a psychologist and even referred him to an optometrist at one point to rule out the possibility that Mr. Sim's headaches were being caused by a vision issue. So Dr. Johar provided constant and repeated care for Mr. Sim. So even if the statements about malingering are taken as true, the record just shows that they were not deliberately indifferent to his medical needs. And with respect to the plaintiff's expert report, as the court noted, the expert report only contained a single sentence about untimely care. It didn't single out any particular treatment as being untimely or unwarranted. And because the standard for deliberate indifference is a high one, it requires more than just negligence, the expert was required to give more explanation and explain why Dr. Patel and Dr. Johar's treatment was so culpable that was more than just negligent to be deliberately indifferent. But that one sentence conclusion doesn't allow the court to make any reasonable inferences that either doctor were deliberately indifferent. So if the court doesn't have any additional questions on the summary judgment order, I'd like to briefly respond to the expert testimony at trial. So Mr. Clark was prohibited, was excluded from testifying as to the possibility of, as to whether the round fired by Officer Durand Ricochet on the day of the incident. That opinion, that the bullet could not have ricocheted, was not in Mr. Clark's report. And so Mr. Clark was properly excluded from testifying as to whether or not the round fired by Officer Durand did bounce off of a hard surface. So, counsel, I understand that the district court said after counsel for the defendants had asked on cross, can this ricochet and then counsel for the plaintiff then tried to get into this and they said that counsel for the defendants had opened the door and the district court said there's no such thing as opening the door. But why is that so? I mean, I understand there's no opening the door clause in the rules of evidence or dealing with experts, but the defendants made a calculated decision to ask the witness who hadn't mentioned ricochet anywhere in his report, could this have ricocheted? And he answered yes. So why would it have been unfair to allow him, irrespective of what was in his report, to then get into, well, they've asked you, could it have ricocheted? You said it could have. Do you have an opinion on whether it did ricochet? Why shouldn't the district court have allowed that, given that defendants made this calculated decision, presumably, to ask him about it on cross? So plaintiff's counsel certainly could have asked Mr. Clark about whether a bullet could ricochet in general as a general property of rubber rounds and hard surfaces. He could not ask him about what specifically happened on that day because he did not conduct any ballistic analysis, he did not do any forensic analysis or scene reconstruction, and he simply did not show that he had the expertise to talk about what happened on that day. Well, the defendants' counsel a number of times objected to that testimony on the grounds that there's no methodology, there needs to be a Daubert hearing, right? Yes. But the district court never conducted a Daubert hearing, correct? Correct. The district court did not conduct a Daubert hearing, but a Daubert hearing wasn't even necessary because there was no foundation laid for any of these expert, these conclusions. And plaintiff's counsel never proffered any such evidence or any such foundation. And so it's also important to note that Mr. Clark's opinion in his actual report were essentially a retelling, a restatement of Mr. Sim's declaration testimony. Mr. Clark wanted to testify that Officer Duran either lied about her training or where she aimed and that Mr. Clark's version of the incident was the correct one. But at that point in the trial, Mr. Sim hadn't testified. There was no evidence in the record that ---- But why does that matter? I mean, experts opine all the time on the information they've been furnished, which includes versions of events in medical records that may not yet be in evidence or the version offered by a particular percipient witness, which the plaintiff certainly is. Why would it matter that technically he hadn't testified yet when experts are allowed to testify about what they believe are reliably reported facts, whether in admissible form or not? So I think you're correct, Your Honor, that it generally doesn't matter. But in this case, when Mr. Clark wanted to essentially testify as to the very exact thing that Mr. Sim was going to testify and in the same breath call Officer Duran a liar, that would simply inappropriately attack Officer Duran's credibility and bolster Mr. Sim's credibility. And expert witnesses are not permitted to make those direct attacks on credibility. Well, the district court did make that finding, that the district court was not going to allow the expert witness to say that Officer Duran was not credible. Correct, Your Honor. And so by excluding that opinion, that's what the district court was doing by excluding Mr. Clark's opinion on that ground. And on top of that, the purpose of expert opinions is to assist the jury in making a factual finding. But by simply repeating or previewing what Mr. Sim is going to testify to, there's no additional benefit to the jury based on Mr. Clark's proffered opinion. And so the district court was correct in excluding that opinion, particularly when the Ricochet opinion, for example, was not even in Mr. Clark's report. And in the briefing, Mr. Sim appellant argues that they were, because of this exclusion, they were prevented from rebutting Officer Duran's version of events, defense case in chief. But that's simply not true. They were able to present Mr. Sim's eyewitness testimony saying that he saw Officer Duran aim in his direction. They pointed to the lack of blue markings on the walls and the floor to suggest that there was no Ricochet. And that was from both experts who testified to that, correct? Correct, Your Honor. And they testified these projectiles leave a mark and that there were no marks. So the defense expert testified that whether it leaves a mark depends on the particular It can leave a mark. Yeah, it can leave a mark. And it depends on the type of surface. So on softer surfaces like wood surfaces, it can sometimes leave a mark. But because these rounds are not painted over, whether they leave a mark can vary from case to case. And so in this case, Mr. Sim was able to offer evidence, to offer testimony rebutting defense case in chief. And it ultimately came down to whether the jury believed Mr. Sim or Officer Duran's version of events. And so for that reason, this court should affirm the district court's summary judgment order and the jury verdict. Thank you, counsel. We'll give you a couple of minutes for rebuttal. I really do appreciate it, Your Honor. Thank you for the time for the rebuttal. With the ricochet, there was an abuse of discretion, if not error, in allowing their expert to testify to a possible ricochet when there is no facts under 702 that would support that. And even in addition to that, I know that the defense is focusing on Mr. Clark's lack of ballistics analysis or reconstruction. Lieutenant Prentiss has never even been to the mess hall where this incident occurred at Wasco State Prison. He didn't do any ballistics training. He did nothing that would support his ability to provide any sort of opinion about a ricochet. And that was all in plaintiff's motion eliminate, which was denied outright by the court. With respect to the medical care or the lack thereof, what that really focuses on with Mr. Sim and Dr. Joel Hall and Dr. Patel is that a neurologist was not seen by him until the January of 2015, when on September 10th, as of that day going forward, Mr. Sim was presenting where he needed a neurologist. And that's where that EEG study, the opinion of Dr. Zardew, opined that that's when that should have happened so it could better address. Without that, there's no baseline to say how much he got worse or anything else. No expert can give that opinion. But what it comes down to is Mr. Sim wasn't provided the care that he should have been provided once he had this severe injury with six staples in his head. With that, I do want to thank the court for your time. I know as a young lawyer, it's a constant learning experience, so I do appreciate the time. We appreciate both of you showing up here today in person, and thank you for your arguments. The case just argued will be submitted for decision, and we'll be in recess for the morning. Thank you.
judges: THOMAS, BENNETT, SUNG